161 N.J. Super. 190 (1978)
391 A.2d 544
HARRY E. CASTROLL ET AL., PLAINTIFFS-RESPONDENTS,
v.
TOWNSHIP OF FRANKLIN ET AL, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted April 17, 1978.
Decided July 24, 1978.
*192 Before Judges ALLCORN, HORN and FURMAN.
Thomas J. Cafferty, attorney for appellants.
Norris, McLaughlin & Marcus, P.C., attorneys for respondent (Mr. Richard A. Norris on the brief).
PER CURIAM.
A review of the record in this case makes plain that plaintiffs-developers completely failed to establish any special reasons within the contemplation of subsection (d) of N.J.S.A. 40:55-39, which would warrant or justify the recommendation or grant of the requested use variance sought by them. Likewise, the proofs were deficient in establishing fulfillment of the negative criteria. Such were also the conclusions of the municipal governing body in rejecting the recommendation of the board of adjustment. We are in full accord with the said conclusions and determination of the governing body. Mayer v. Montclair Bd. of Adj., 32 N.J. 130, 140 (1960).
The failure of plaintiffs-developers to establish special reasons becomes even more apparent when it is observed that the resolution of the board of adjustment recommending the variance did not make or set forth any fact findings as constituting the special reason or special reasons on which it predicated its recommendation. Thus, after a prefatory recital consisting almost entirely of a summary of portions of the testimony of various of the witnesses, the board simply concluded: "That the granting of said variance will promote the general health, safety and welfare"  without in any way setting forth in what specific respect or respects the general health, safety and welfare of the community would be advanced.
Quite aside from the failure of proof, this latter procedural deficiency in itself is fatal. The recommendation *193 of a variance must be grounded upon "a statement of the specific findings of fact on which the Board reached the conclusion"; the recommendation of a variance "on a summary finding couched in the conclusionary language of the statute is not adequate." Harrington Glen, Inc. v. Leonia Bd. of Adj., 52 N.J. 22, 28 (1968).
Despite the absence of any specific findings, the dissent nevertheless assumes that the board of adjustment recommended the variance based on the "evidence set forth in the resolution" that the garden apartment complex proposed by the applicants, private commercial developers, would provide "multi-family housing which was needed for the `mid-income group'"  whatever that may be. Commencing with the hypothesis that the need for housing for low and moderate-income families constitutes a special reason justifying a variance, the dissent concludes that there is a need for "median income" housing as well, and that the asserted need of this undefined group likewise constitutes a sufficient special reason for the granting of a variance.
The dissent posits his assumption that there is a need for housing for this undefined class upon a single conclusionary statement of one expert witness (John Lynch) produced by plaintiffs-developers, to the effect that "there is also a strong need [for housing] in this next level above that [low and moderate income]." This bare conclusion was completely unsupported by any underlying factual evidence. No data whatever was supplied to demonstrate the number of families in this "median income" class, or to establish any need for additional housing for such "class," either state-wide or area-wide. An expert opinion which is completely lacking in factual foundation is utterly worthless. Expert opinion must be based on facts and data established by evidence at the hearing. Skupienski v. Maly, 27 N.J. 240, 246 (1958); Evid. R. 56.
Be this as it may, not surprisingly there is not a single case cited by the dissent which holds that proposed private *194 commercial housing for even low or moderate-income families (let alone median-income families) constitutes a special reason warranting the grant of a use variance under subsection (d)  with the exception of the case of Brunetti v. Madison Tp. Mayor and Council, 130 N.J. Super. 164 (Law Div. 1974). A decision authored by our dissenting colleague, Brunetti has never been subjected to the testing of appellate review. Indeed, although decided in 1974, Brunetti has yet to be cited with approval in the opinion of any appellate court in this State. On the single occasion on which it was mentioned  in a footnote to the opinion of the Supreme Court in Fobe Associates v. Demarest Mayor and Council, 74 N.J. 519 (1977)  the court observed:[1]
The decision in Brunetti v. Mayor, Coun. Tp. of Madison, 130 N.J. Super. 164 (Law Div. 1974), upholding a variance for construction of garden apartments on the grounds that such housing constitutes a special reason within the scope of N.J.S.A. 40:55-39 d. has been criticized as "subverting rational land use planning" so as to "inevitably result in even greater misplanning in New Jersey suburbs." Mallach, "Do Lawsuits Build Housing?: The Implications of Exclusionary Zoning Litigation," 6 Rutgers-Camden L.J. 653, 658, 676 (1975). Granting such variances "largely on the basis of the absence of negative findings, would result in arbitrary changes in the use of land, precluding serious planning for services, facilities, traffic circulation and other community needs." Id. at 659. To the same effect, Mytelka, "The Mount Laurel case: Where to Now?", 98 N.J.L.J. 513, 522 (1975). See also Mytelka and Mytelka, "Exclusionary Zoning: A Consideration of Remedies", 7 Seton Hall L. Rev. 1, 11 (1975), rejecting the special use exception for low and moderate income housing as a remedy for exclusionary zoning because of its potential for abuse. [at 536, n. 5]
No one can quarrel with the proposition that adequate housing for families of low and moderate income *195 in areas deficient in and requiring such housing is a matter of public concern. Even upon the dubious assumption that there is a need for "median income" housing, as well, the existence generally of such need (whether low, moderate or median), however, is not the one-all upon which a use variance for such purpose may or should be grounded. Pascack Ass'n, Ltd. v. Washington Tp. Mayor & Council, 74 N.J. 470 (1977). Other concerns of equal or greater magnitude also must be given consideration and weight in reaching a determination as to whether a special reason or special reasons does or do exist that would justify the grant of the variance. See, for example, the discussion in Fobe Associates, supra 74 N.J. at 532-537, inclusive; Kohl v. Fair Lawn Mayor and Council, 50 N.J. 268 (1967) and DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 439-442 (1970). Thus, in addition to a demonstrated need for such housing, there must be considered such other significant factors as the character of the community and the surrounding area, the extent and nature of development of the community and the surrounding area, whether the community already has provided or has made provision for its fair share of the needed housing in the area, whether there are other districts in the community where the proposed housing may be constructed as a lawful permitted use under the current zoning regulations, whether the site for which the use variance is sought is peculiarly suited for such use, and many other factors of significance, including those relating to the negative criteria of the statute.
And so here, there are no findings as to the projected number of multi-family dwelling units that are or will be required in the foreseeable future in the area generally or in Franklin Township specifically. There is no finding as to the extent and nature of the development of the community presently  no indication of the number of currently existing and occupied or available multi-family homes for families of low income, moderate income or "median income," no indication of the number estimated to constitute *196 Franklin Township's fair share of the projected needs. Hence, it is literally impossible to determine whether Franklin Township has already provided its fair share of such housing or more or less than its fair share of such housing. There is no evidence or finding that this specific location is the only site available or suitable for the housing proposed. As a matter of fact, the local zoning ordinance and map would indicate the existence of at least 10 or 11 zoning districts in which the proposed multi-family dwelling complex could be constructed as a lawful permitted use  and in which no use variance is required.
It is still the rule in New Jersey that a private commercial housing development does not inherently serve the public good and welfare. Kohl v. Fair Lawn Mayor and Council, supra. And where, as here, "the use is not of the type [which] of itself provides special reasons, such as a school or hospital, there must be a finding that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." Kohl, supra, 50 N.J. at 279.
Significantly, plaintiffs-developers here make no explanation why they could not construct this development on the 4 1/2 acres which lie entirely within the B-2 zone (where such a use is permitted), seeking a variance only from the five-acre minimum land requirement. Whether plaintiffs-developers rejected this approach for fear the municipal authorities might require a reduction in the number of dwelling units, thus resulting in a proportionate reduction in the profitability of the enterprise, or for some other reason, does not appear in the record. Suffice it to say that, rather than taking this approach, they proposed to acquire this adjoining tract of approximately one-half acre situated in an R-7 zone  a district restricted to one-family and two-family dwellings.
Noteworthy too, is the fact that plaintiffs-developers do not propose to utilize this half-acre tract as the site of a portion of the dwelling units. Their design rather is to *197 utilize it solely as a parking lot for the parking of the automobiles of residents of the apartments and their guests. The evils accompanying the intrusion into a one-family and two-family residential district of a one-half acre automobile parking lot are manifest: the danger to the residents of the neighborhood from the substantial increase in the movement of a much greater number of vehicles in the area; the annoyance and inconvenience to the neighborhood resulting from the noise, engine fumes, headlights and parking lot lights attendant upon the use of the lot at all hours of the day and night; the unsightliness of the parking lot in such a residential district; the obviously depreciating effect on the values of the properties adjoining and in the near neighborhood, along with many other detrimental effects. In the face of these circumstances, it is a virtual impossibility to conclude that the relief here sought by plaintiffs-developers "can be granted without substantial detriment to the public good" or to find that the variance "will not substantially impair the intent and purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55-39(d); Fobe Associates v. Demarest Mayor and Council, 74 N.J. 519, 537-539 (1977).
Quite aside from all the foregoing, and although the dissent intimates that the proposed housing would be available to families of moderate income also, a fundamental defect is the basic fact that the dwelling units in the apartment complex proposed are not within the financial reach of families of either low or moderate income, and hence would not be available to them  a fact conceded at the hearing by plaintiffs' expert. And, as already noted, there is complete absence in the record of proof of any need for housing for the undefined "median income" group. Plainly, the essential predicate of the conclusion of the dissent that a special reason is present to justify the grant of a variance is thus without any foundation whatever  even upon the dubious assumption that such need would constitute a special reason within the comprehension of N.J.S.A. 40:55-39(d).
*198 Moreover, it is rather telling that none of the plaintiffs-developers testified or otherwise committed themselves to a rental of $250 monthly, plus utilities; nor was there any commitment to refrain from an increase in initial rentals for any given period or term. Thus, there is not even proof of the rentals proposed to be charged by the testimony of any of the persons having knowledge and control thereof  simply the speculation of a paid expert witness (Lynch). It should also be noted at this juncture that although public housing and quasi-public housing are subject to stringent governmental rent controls, the same controls are not applicable to privately financed and operated commercial housing such as the development here proposed. Hence, however this proposed housing is characterized as to the income class it is to serve, there is no assurance or commitment that, once constructed, the rentals would even be within the financial means of the undefined "median income" group.
In light of the foregoing  (1) the failure of the board of adjustment to make findings of fact and conclusions, (2) the absence of any evidence that would establish a special reason or reasons sufficient to warrant a recommendation or a grant of the variance, (3) the failure of plaintiffs-developers to establish compliance with the negative criteria of N.J.S.A. 40:55-39(d),  the judgment of the Law Division is reversed; and the cause is remanded to the Law Division with directions to enter judgment in favor of defendants against the plaintiffs-developers.
FURMAN, J.S.C. (temporarily assigned), dissenting.
I would decide this appeal on an issue of general applicability in the law of zoning, that is, whether the need for multi-family housing within the financial means of families of median and less income is a special reason justifying a zoning variance under N.J.S.A. 40:55-39(d) (substantively reenacted as N.J.S.A. 40:55D-70, effective August 1, 1976).
*199 The majority rests its decision on three grounds. I differ with the majority on all three. The first two are limited to this record. The majority concludes that the Franklin Township board of adjustment failed to make specific findings of fact and that respondents' proofs were deficient as to the so-called negative criteria in N.J.S.A. 40:55-39.
In its resolution the board of adjustment recites that it has made the "following findings of fact" and has concluded that a variance should be granted based upon the "following evidence." It then sets forth in separately lettered paragraphs what various witnesses testified and its conclusions based upon the "foregoing findings of fact." Although inartfully drawn, I read these recitals as signifying that the board of adjustment found as facts the contents of the various witnesses' testimony. The plain intent of the board was to make findings of facts in accordance with the evidence, not to make findings that various witnesses had in fact testified as set forth in the resolution.
Further, I am convinced, as will be developed infra, that the evidence set forth in the resolution amply supports the ultimate conclusions of the board of adjustment that the granting of the variance would promote the general welfare, by providing multi-family housing which was needed for the "mid-income group," without substantial detriment to the public good and without substantial impairment of the intent and spirit of the zoning plan.
Dealing next with the negative criteria, respondents complied with the zoning requirements for a 60-unit garden apartment complex as a special exception use in the B-2 business zone, except that the lot size of 4.576 acres was less than the minimum permissible lot size of five acres. Respondents assembled a five-acre lot by acquiring a contiguous .561-acre lot in B-2. That small parcel was subsequently rezoned to R-7 (single-family residential on 7500 to 9000 square foot minimum lots). Respondents' testimony *200 that no other contiguous lot was available in B-2 to make up five acres within that zone was unrebutted.
No threat to the public good is discernible. Site plan approval had been granted. The premises as undeveloped are a health hazard, swampy, mosquito-ridden and piled up with debris. Drainage would be improved and, as improved, adequate. An adjacent street would be paved. Traffic flow would not be impeded nor traffic safety imperiled. The fire chief was satisfied about access for fire-fighting equipment. Water and sanitary sewer utilities would be available to service the garden apartment complex.
With respect to whether the intent and spirit of the zone plan would be substantially impaired, the variance application should be viewed in perspective. Only the parking lot for the project was to be located in R-7, on a corner of a block most of which is zoned B-2. The board of adjustment granted the special exception use for the garden apartment complex in B-2, subject to a variance for an ancillary parking use in R-7. After a hearing the board recommended the granting of the variance to the governing body. The governing body without a hearing denied the variance. The approval of the special exception use in B-2 is unchallenged.
Unmistakeably the parking lot use in R-7 would provide a transition or buffer between commercial and multi-family uses and single-family residential uses. It would be screened from the few neighboring houses by trees and shrubs. A nearby supermarket failed and the commercial viability of the neighborhood is uncertain. The neighbors who testified favored the project. A petition of 100 nearby residents supporting the variance application was submitted to the board of adjustment.
Any variance impairs the zoning plan in the sense that it deviates from and thus modifies the zoning plan. But I cannot detect on this record any support for the conclusion that the granting of a variance for a parking lot ancillary to a permitted special exception multi-family use would *201 substantially impair or derogate from the intent and spirit of the zoning plan. The evidence is overwhelmingly to the contrary.
Finally, the majority concludes that no special reason was established for a zoning variance. The majority opinion points out correctly that respondents projected rentals that would be beyond the financial means of families of low and moderate income, according to the data available at the time of the board of adjustment hearing in 1975. But the rentals of $250 a month with utilities of $30 a month would be only $97.50 a year above what could be afforded by families at the upper range of moderate income (up to 80% of median income) and well within the financial reach of families of median income.
I do not understand that the majority rules out the need for low and moderate income as a special reason justifying a zoning variance. Rather the majority concludes factually that respondents' project would not serve that need.
The judicial focus in this field has been directed towards the need for low and moderate housing with exceptions to be discussed infra. The rationale of South Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975), and Oakwood at Madison, Inc. v. Madison Tp., 117 N.J. Super. 11 (Law Div. 1971), certif. granted 68 N.J. 185 (1972), on remand 128 N.J. Super. 438 (Law Div. 1974), mod. and aff'd as mod. 72 N.J. 481 (1977), is that provision for low and moderate-income housing needs is encompassed within the general welfare and must not be unreasonably ignored or thwarted in a municipal zoning ordinance. See also, Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 265 (1976).
Similarly, other branches of government have concentrated on the critical housing shortages for low and moderate-income families.
In Executive Order No. 35, dated April 2, 1976, Governor Byrne stated that *202 * * * there exists a serious shortage of adequate, safe and sanitary housing accommodations for many households at rents and prices they can reasonably afford, especially for low and moderate income households, newly formed households, senior citizens, and households with children.
The Legislature, in the preamble to the New Jersey Housing Assistance Bond Act of 1975, L. 1975, c. 207, § 2(a), made a finding:
Despite the existence of numerous Federal programs designed to provide housing for senior citizens and families of low and moderate income, construction and rehabilitation of such housing units has not proceeded at a pace sufficient to provide for the housing need of the State.
Special reasons for variances are derived from the zoning standards, including the "general welfare" in N.J.S.A. 40:55-32; Kunzler v. Hoffman, 48 N.J. 277, 286 (1966); Kramer v. Sea Girt Bd. of Adj., 45 N.J. 268, 290 (1965).
Most Supreme Court opinions sustaining special reasons for variances have dealt with public or private institutional uses. Kunzler, supra (private hospital for emotionally disturbed); Burton v. Montclair, 40 N.J. 1 (1963), and Black v. Montclair, 34 N.J. 105 (1961) (extension of private secondary and elementary schools); Andrews v. Ocean Tp. Bd. of Adj., 30 N.J. 245 (1959) (parochial school to serve region).
Kunzler, supra; Kramer, supra (fireproof hotel to replace dangerous structure) and Yahnel v. Jamesburg Bd. of Adj., 79 N.J. Super. 509 (App. Div. 1963), certif. denied 41 N.J. 116 (1963) (telephone equipment building) have recognized special reasons even though involving private profit.
Kohl v. Fair Lawn Mayor and Council, 50 N.J. 268, 279 (rejecting a variance for expansion of a dairy), drew the distinction that a special reason for a variance must inherently serve the public good. In Fobe Associates v. Mayor and Council, 74 N.J. 519 (1977), the Supreme Court *203 mooted but did not decide whether "a variance to provide additional [private] rental housing in a region which plainly needs it is `inherently' for the general welfare, in the Kohl sense of the concept."
The closest Supreme Court case in point is DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428 (1970), which holds that semi-public, multi-family housing accommodation is a special reason justifying a variance under the circumstance that it would relieve and replace substandard housing in ghetto areas. On the trial court level, Brunetti v. Madison Tp. Mayor and Council, 130 N.J. Super. 164 (Law Div. 1974), directing the granting of a variance for a large garden-apartment complex, reasons that: "A need for low and moderate income housing constitutes a special reason justifying a zoning variance, whether served by semi-public housing as in DeSimone or by private housing * * *." The need is identical, however served.
Judge Larner, in Weiner v. Glassboro Bd. of Adj., 144 N.J. Super. 509, 515 (App. Div. 1976), states that: "[T]his court accepts the beneficent public welfare purpose of encouraging housing for senior citizens and the propriety of such a use as a permissible ground for a special reason variance * * *."
In his concurring opinion in Pascack Ass'n Ltd. v. Mayor and Council, etc., 74 N.J. 470, 493 (1977), Justice Sullivan projects special exceptions and variances as solutions for the low and moderate-income housing shortage in substantially developed municipalities, as follows: "Indeed, I would hold that a demonstrated need for a particular type of conventional housing would constitute a special reason authorizing the grant of a variance, provided the negative criteria of the statute are satisfied." Justice Pashman expresses agreement with that statement by Justice Sullivan, in his dissent in Fobe Associates, supra 74 N.J. at 544.
In his dissent in Shepard v. Woodland Tp. Comm., 135 N.J. Super. 97, 101 (App. Div. 1975), rev'd 71 N.J. 230 *204 (1976), Judge (now Justice) Handler states: "Housing needs are clearly encompassed within the general welfare and indeed may embrace a governmental imperative."
Weymouth, supra 71 N.J. at 278, made it clear that the Supreme Court has rejected the "physical use" test that, as part of his proof in a special reason variance case, the applicant must rule out the physical suitability of the property for any of the permissible uses under the zoning ordinance.
On this record the need for median-income housing in Franklin Township and in the region is clear. Respondents' expert testified without rebuttal to a "sizable" regional housing need within the projected rental range and that the mid-income group was "hard hit" by a multi-family housing shortage. He testified further that respondents' garden apartment complex would be "least cost" housing at the lowest rental range on the private market without governmental subsidy. See Rose, "A new Test for Exclusionary Zoning: Does It Preclude the Opportunity for `Least Cost' housing," 6 Real Estate L.J. 91, 95 (1977); see also, Wolfson, "Exclusionary Zoning and Timed Growth: Resolving the Issue After Mount Laurel," 30 Rutgers L. Rev. 1237, 1248-49 (1977).[1]
My conclusion is that provision for the multi-family housing needs of families of median income and less substantially promotes the general welfare and constitutes a special reason justifying a zoning variance.
Inganamort v. Fort Lee, 62 N.J. 521 supports that conclusion in sustaining municipal authority to enact a rent control ordinance in view of the "critical need" for *205 rental housing without distinction as to rental range, as does Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481 (1977), in recognizing the significant contribution of least cost housing towards relieving the serious housing shortage:
To the extent that the builders of housing in a developing municipality like Madison cannot through publicly assisted means or appropriately legislated incentives... provide the municipality's fair share of the regional need for lower income housing, it is incumbent on the governing body to adjust its zoning regulations so as to render possible and feasible the "least cost" housing, consistent with minimum standards of health and safety, which private industry will undertake, and in amounts sufficient to satisfy the deficit in the hypothesized fair share.

* * * * * * * *
Nothing less than zoning for least cost housing will, in the indicated circumstances, satisfy the mandate of Mount Laurel. While compliance with that direction may not provide newly constructed housing for all in the lower income categories mentioned, it will nevertheless through the "filtering down" process referred to by defendant tend to augment the total supply of available housing in such manner as will indirectly provide additional and better housing for the insufficiently and inadequately housed of the region's lower income population. [at 512, 513, 514]
The majority attaches significance to the potential for multi-family housing elsewhere in Franklin Township and the lack of any proof that the municipality has not provided or made provision for its fair share of such housing. The fair share concept is relevant in an attack on a zoning ordinance but not so on a variance application. The municipality's potential for garden apartments and other multi-family housing does not negate or diminish the present serious need for median-income housing, which the variance sought by respondents would significantly provide for with 60 housing units. Respondents, as owners of the property, were before the board of adjustment and the governing body ready to proceed with construction upon the granting of a variance for a parking lot. No other pending or proposed multi-family housing project within the township is referred to in the record.
*206 I would reject a construction of N.J.S.A. 40:55-39(d) that respondents, in applying for a use variance based upon housing need, did not sustain their burden of proof because they failed to rule out the availability and suitability for median-income housing of any other parcel of land within the zones permitting multi-family housing as a special exception use. That burden would be a formidable one. I would affirm Judge Diana's determination that it was unreasonable under the evidence for the governing body, in rejecting the board of adjustment's recommendation of a use variance, not to conclude that a special reason was established, that is, the need for multi-family housing for families of median income and less, and that the negative criteria were satisfied.
NOTES
[1] The case was cited with approbation by only a single justice in a dissent in Fobe Associates, infra, in a concurrence by him in South Burl. Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, 193 (1975), and again in a concurrence and dissent by him in Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481, 554 (1977).
[1] The stated availability of sanitary sewer access also contributes toward bringing this proposed apartment complex within the range considered to be "least cost" housing by eliminating the added expense to the developer of constructing a private system and passing on this cost to the consumer. See, Wolfson, supra, nn. 63-67 and accompanying text.